**Ralph W. KEITH et al., Plaintiffs,**

**v.**

**John A. VOLPE, as Secretary of Transportation, et al., Defendants.**

**Civ. No. 72–355–HP.**

United States District Court,
C. D. California.

July 7, 1972.

Motion to Amend Denied Sept. 11, 1972.

Brent N. Rushforth and Frederic P. Sutherland, Center for Law in the Public Interest, Los Angeles, Cal., Rosalyn M. Chapman, Western Center on Law & Poverty, Los Angeles, Cal., Thomas J. Graff, Environmental Defense Fund, Berkeley, Cal., Kenneth L. Nelson, City Atty., Hawthorne, Cal., Beatrice Challiss Laws, Sierra Club Legal Defense Fund, J. Anthony Kline, San Francisco, Cal., for plaintiffs.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civil Division, Gary H. Giesler and Matthew A. Schumacher, Asst. U. S. Attys., Los Angeles, Cal., for federal defendants.

Harry S. Fenton, Sacramento, Cal., Joseph A. Montoya, Los Angeles, Cal., Kingsley Hoegstedt, Sacramento, Cal., Norval Fairman, San Francisco, Cal., Charles E. Spencer, Jr., Los Angeles, Cal., for state defendants.

Royal M. Sorensen, City Atty., Downey, Cal., and Burke, Williams & Sorensen, Los Angeles, Cal., for intervenors.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

PREGERSON, District Judge.

This suit was brought to halt work on the proposed Century Freeway until such time as the responsible federal and state officials comply with certain constitutional, statutory, and administrative requirements which, plaintiffs contend, they have heretofore failed to satisfy.

The matter came on for hearing on May 2, 3, 4, and 5, 1972, on plaintiffs' motion, filed pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction. Having studied the briefs, affidavits, and exhibits submitted by counsel prior to the aforesaid hearing, having heard the testimony offered and the arguments of counsel made at the aforesaid hearing, having studied the briefs and affidavits submitted by counsel after the conclusion of the hearing, and having studied the authorities cited by counsel, the Court has concluded that defendants have adequately complied with some of the aforementioned legal requirements, but have failed to comply with others. Therefore the Court will issue a preliminary injunction.

Plaintiffs herein are four couples who live in the path of the proposed freeway, the National Association for the Advancement of Colored People, the Sierra Club, the Environmental Defense Fund, an unincorporated association named "Freeway Fighters," and the City of Hawthorne. Defendants herein are various state and federal officials and agencies. One group of defendants, sometimes referred to as "federal defendants," consists of John A. Volpe, the Secretary of the United States Department of Transportation; Sheridan A. Farin, the Administrator of Region 7 of the Federal Highway Administration, an agency within the Department of Transportation; and Donald E. Trull, the Division Engineer for the Federal Highway Administration in California. A second group of defendants, sometimes referred to as "state defendants," consists of the California Highway Commission; the California Department of Public Works; James A. Moe, the Director of the Department of Public Works; and Robert Datel, the State Highway Engineer of the California Division of Highways, an agency within the Department of Public Works. Plaintiffs contend that defendants have failed to comply with a federal environmental protection statute;[1] a California environmental protection statute;[2] fed-

---

1. The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347.

2. The California Environmental Quality Act of 1970, Calif.Pub.Res.Code §§ 21000–21151.

eral statutes protecting homeowners, tenants, and businessmen who must relocate because of the construction of highways funded with federal aid;[3] and a federal statute requiring that public hearings be held prior to the construction of any federal-aid highway.[4] Plaintiffs also charge that federal defendants are violating the due process clause of the Fifth Amendment to the United States Constitution and that state defendants are violating the due process and equal protection clauses of the Fourteenth Amendment.

A sketch of the proposed freeway is in order. If and when the Century Freeway is completed, it will, as presently planned, stretch a distance of 17 miles across the southern portion of the densely populated Los Angeles basin. It will connect the Los Angeles International Airport on the west with the San Gabriel River Freeway (Route I–605) on the east; it will also intersect with the San Diego, Harbor, and Long Beach Freeways (Routes I–405, 11, and 7, respectively). The freeway will traverse the cities of El Segundo, Hawthorne, Inglewood, Lynwood, South Gate, Paramount, Downey, and Norwalk, the Watts section of the City of Los Angeles, and unincorporated areas of Los Angeles County, including the communities of Willowbrook and Del Aire. Federal officials have designated the freeway as a part of the interstate highway system—specifically, Route I–105. Therefore 90% of the cost of the freeway will be borne by the federal government, although the California Division of Highways will actually acquire the right-of-way and construct the road. The total cost of acquiring the land and actually constructing the freeway has been estimated at $501,800,000. It has also been estimated that 9000 families, consisting of 21,000 individuals, will be displaced by the freeway and that 3900 single-family dwellings and 3000 multiple-family dwellings will be acquired in order to clear the right-of-way.

The planning and design of a federal-aid highway is a lengthy process. The applicable statutes and regulations require a series of public hearings and, in addition, the submission by state officials of detailed proposals and assurances to officials of the Department of Transportation [hereinafter DOT] and the Federal Highway Administration [hereinafter FHWA] for approval. See, e. g., the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq.; the FHWA's Policy and Procedure Memorandum 20–8 (Jan. 14, 1969) [hereinafter PPM 20–8], 23 C.F.R. Part 1, Appendix A; Lathan v. Volpe, 455 F.2d 1111, 1115–1116 (9th Cir. 1971). A public hearing on one aspect of the Century Freeway was held as long ago as June 1963, and the Division of Highways is now in the midst of acquiring the right-of-way for the freeway. According to the testimony of an official of the Division of Highways, as of approximately April 24, 1972, the Division had acquired 3388 parcels of land for the freeway, which represented 55.8% of the 6073 parcels that it intended to eventually acquire. It had acquired these parcels for a total of $88,651,000. In addition, the Division had reached agreements with the owners of 169 other parcels that were still in escrow. In one segment of the freeway corridor, however, the Division had already acquired 85.1% of the parcels, while in another segment it had only acquired 39.7%. A second official testified that as of approximately May 3, 1972, 2840 residences in the freeway corridor had been vacated. According to the testimony of a third official, the Division of Highways at present intends to begin actual construction of the freeway during the third

---

3. Chapter V of the Federal-Aid Highway Act of 1968, 23 U.S.C. §§ 501–511, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601–4655. Plaintiffs also rely on the Urban Mass Transporta-

tion Act of 1964, 49 U.S.C. §§ 1601–1612, but concede that it does not technically apply to the Century Freeway.

4. Section 128(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 128(a).

quarter of 1972 and to complete construction by the middle of 1977.

With that picture of the proposed freeway and of the work that has already been performed in mind, the Court will turn to the specific legal issues raised by this lawsuit.

*The National Environmental Policy Act of 1969:*

Nearly three years ago, in response to growing public concern with the deterioration of the nation's environment, Congress enacted the National Environmental Policy Act of 1969 [hereinafter NEPA], 42 U.S.C. §§ 4321–4347. The statute went into effect on January 1, 1970. Section 101 of NEPA, 42 U.S.C. § 4331, contains a declaration by Congress of a comprehensive national environmental policy. Section 102(2) (C), 42 U.S.C. § 4332(2)(C), establishes a mechanism for carrying out that policy. It "authorizes and directs that, to the fullest extent possible," every agency of the federal government shall

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

In the words of Judge Skelly Wright, "NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department."

Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1112 (1971). NEPA also established a Council on Environmental Quality [hereinafter Council], and in guidelines promulgated pursuant to NEPA that body stated,

"The objective of section 102(2)(C) * * * is to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action * * *." Statements on Proposed Federal Actions Affecting the Environment, 36 Fed.Reg. 7723, 7724, ¶ 1 (April 23, 1971).

To quote again from the *Calvert Cliffs'* decision, moreover,

"* * * [T]he Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority." 449 F.2d at 1115. [Emphasis in original.]

*See also* Daly v. Volpe, 350 F.Supp. 252 (W.D.Wash.1972). The federal defendants have not filed the environmental impact statement required by Section 102(2)(C), and plaintiffs insist that they must do so. Federal defendants concede that the construction of freeways with federal funds does constitute "major Federal actions, significantly affecting the quality of the human environment," within the meaning of NEPA. They contend, however, that NEPA does not apply to projects that were in as advanced a state of completion as was the Century Freeway at the time that NEPA went into effect—*i. e.,* on January 1, 1970.

No provision of NEPA explicitly discusses the statute's applicability to projects that were already in existence on January 1, 1970, and "a volatile dispute in the law has emerged on the extent to which NEPA, and particularly Section 102(2)(C), applies to an ongoing project." Environmental Law Fund v. Volpe, 340 F.Supp. 1328, 1331

(N.D.Cal.1972).[5] The Council's guidelines promulgated pursuant to NEPA, however, address themselves to this question. They provide,

"To the maximum extent *practicable* the Section 102(2)(C) procedure should be applied to further major federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program." Statements on Proposed Federal Actions Affecting the Environment, *supra*, 36 Fed.Reg. at 7727, ¶ 11. [Emphasis added.]

Federal defendants argue, in light of the Council's guidelines, that application of NEPA to the Century Freeway would not be practicable.

In November 1970 the FHWA promulgated interim regulations spelling out the circumstances under which that agency considered the application of NEPA to a freeway, the planning of which had commenced prior to January 1, 1970, to be appropriate. Interim Guidelines for Implementation of Section 102(2)(C) of the National Environmental Policy Act of 1969, ¶ 4 (Nov. 24, 1970) [hereinafter Interim Guidelines]. The key element in the FHWA's formula was the date or dates on which the highway in question received "design approval" from the FHWA—*i. e.*, the date or dates on which the FHWA approved the engineering design proposed by the state highway authorities, following public hearings, in accordance with PPM 20–8, ¶ 10. If the highway in question received design approval after February 1, 1971, compliance with NEPA would be necessary. If design approval was received before February 1, 1971—a date thirteen months after NEPA went into effect—compliance with NEPA was *not* ordinarily necessary. The Interim Guidelines did require the state highway authorities to reassess highway projects that had received design approval before February 1, 1971, if those projects entailed the acquisition of substantial amounts of real estate. Interim Guidelines, ¶ 4c. This reassessment was to be performed "in consultation with" the FHWA division engineer, and its purpose was to determine whether the project had been "developed in such a manner as to minimize adverse environmental consequences." No Section 102(2)(C) statement was necessary, however, "unless requested by the division engineer." *Id.*

The state defendants divided the Century Freeway into eight segments for

---

5. Courts have refused to hold Section 102 (2)(C) applicable to projects that were in existence on January 1, 1970, in Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613 (3d Cir. 1971); San Francisco Tomorrow v. Romney, 342 F.Supp. 77 (N.D.Cal. 1972); Environmental Law Fund v. Volpe, *supra*; Jicarilla Apache Tribe v. Morton, No. CIV 71–566–PHX–WCF, 3 ERC 1919 (D. Ariz., March 14, 1972); Citizens to Preserve Foster Park, Inc. v. Volpe, No. Civ. 71 F 71, 3 ERC 1031 (N.D.Ind., Aug. 18, 1971); Elliot v. Volpe, 328 F. Supp. 831 (D.Mass.1971); Brooks v. Volpe, 319 F.Supp. 90 (W.D.Wash.1970), motion for rehearing denied 329 F.Supp. 118 (W.D.Wash.1971), rev'd on other grounds 460 F.2d 1193 (9th Cir., 1972); Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Or.1970). Courts have held Section 102(2)(C) applicable to such projects in Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, *supra*; Named Individual Members of San Antonio Conservation Society, Inc. v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971); Morningside-Lenox Park Ass'n, Inc. v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971); Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1971).

the purpose of preparing design proposals for submission to the FHWA. Design approval was obtained for three of those segments prior to January 1, 1970. Design approval for the remaining five segments was received between January 1, 1970, and February 1, 1971.[6] The Interim Guidelines, therefore, required only that the state highway authorities reassess the Century Freeway project. A reassessment, dated March 15, 1971, was prepared by the state defendants; it concluded that the Century Freeway project had been "developed in such a manner as to give detailed consideration to the potential impact upon the quality of the human environment * * *." The FHWA division engineer concurred in that evaluation on April 1, 1971.[7] The division engineer never requested a Section 102(2)(C) statement.

Federal defendants urge the Court to approve the decision not to require the preparation of a Section 102(2)(C) statement. This the Court cannot do, because the defendants have failed to satisfy NEPA's commandments.

■ The message of NEPA is loud and clear. Section 101(a) declares that

"it is the continuing policy of the Federal Government * * * to use all practicable means and measures * * * to create and maintain conditions under which man and nature can exist in productive harmony * * *."

Section 101(b) provides that in order to carry out this policy,

"it is the continuing responsibility of the Federal Government to use all practical means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may * * * assure for all Americans safe, healthful, productive, and

esthetically and culturally pleasing surroundings * * *."

Section 102 of NEPA

"authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [Section 101], and (2) all agencies of the Federal Government shall, [inter alia, prepare the environmental impact statements described in subsection (2)(C)]."

In light of the Congressional directive that "to the fullest extent possible * * the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth" in Section 101 of NEPA, the Court believes that the application of NEPA to a federal-aid highway should not be considered impracticable until, as the Court of Appeals for the Fourth Circuit recently held, the highway "has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom." Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972). The Century Freeway has not yet reached that state.

■ The purpose of Section 102(2)(C) clearly is, in the words of paragraph 1 of the Council's guidelines, "to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action * * *." See also DOT Order 5610.1, § 7(d) (Oct. 7, 1970); Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, supra, 449 F.2d at 1113. The planning stage of a federally-funded highway ends when the highway receives design approval from the FHWA. See PPM 20–8, ¶ 10; cf. Wildlife Preserves, Inc. v. Volpe, 443

---

6. Design approval for the eight segments was obtained on the following dates: August 14, 1968; September 10 and December 23, 1969; February 12, April 14, July 2, December 1, and December 15, 1970. In addition, the design that received approval on September 10, 1969, was subsequently revised; the revisions received design approval on December 23, 1970.

7. See Exhibit SS to Conrado affidavit, filed with the Court on April 7, 1972.

F.2d 1273 (3d Cir. 1971). Although the planning stage of the Century Freeway had commenced before January 1, 1970, it had not been completed by that date—*i. e.*, no design approval had yet been received for five of the eight segments of the highway. The "agency decision making process," in other words, was still open when NEPA went into effect. The freeway, as a result, was still at that stage of its development in which a "careful consideration of the environmental aspects" would have been most "appropriate," and failure to comply with Section 102(2)(C) defeated the basic purpose of NEPA. Since five of the freeway's eight segments were still in their planning stage, moreover, the general judicial policy against the retroactive application of statutes—*see, e. g.*, Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); Union

Pacific R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913)—was inapplicable.

Judge Peckham recently observed, "Obviously, if the planning phase has not been completed, it is still *practicable* to file a statement." Environmental Law Fund v. Volpe, *supra,* 340 F.Supp. at 1334. [Emphasis added.] Paragraph 4 of the FHWA's Interim Guidelines in actuality postponed the effective date of NEPA for thirteen months, except for cases in which the FHWA division engineer decided, apparently on the basis of a balancing of various environmental and non-environmental considerations, that preparation of a Section 102(2)(C) statement was appropriate.[8] NEPA does not authorize such flexibility, and the provision emasculates both NEPA and the Council's guidelines.[9]

---

8. In Environmental Law Fund v. Volpe, *supra,* Judge Peckham wrote,

 "Thus, even if a project were initiated prior to January 1, 1970, if the planning phase of the project did not take place until after January 1, 1970, a NEPA statement is required. No balancing of factors can be permitted in such a case; the state highway department *must* file a statement in compliance with Section 102(2)(C). However, if all the planning for a project took place *prior* to January 1, 1970—that is, if design approval preceded the passage of NEPA— a Section 102(2)(C) statement is required only if 'practicable.'" 340 F. Supp. at 1333. [Emphases in original; footnotes omitted.]

 Judge Craven, the author of the opinion in Arlington Coalition on Transportation v. Volpe, *supra,* went further, holding Section 102(2)(C) applicable to a highway, the planning of which had been completed before January 1, 1970. After concluding that NEPA was "applicable to a project until it has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom," he added,

 "Manifestly the date of design approval alone *does not accurately* measure whether Arlington I–66 has reached the crucial stage, and determining the applicability of Section 102(C) by this standard alone would be *arbitrary and capricious agency action and an abuse of ad-*

 *ministrative discretion.* Administrative Procedure Act, 5 U.S.C.A. § 706(2) (A)." 458 F.2d at 1332 [Emphasis added.]

9. In August 1971 the FHWA promulgated permanent regulations to replace the Interim Guidelines. Policy and Procedure Memorandum 90–1 (Aug. 24, 1971) [hereinafter PPM 90–1]; *see especially* ¶ 5. The key element in the new formula is still the date or dates on which the highway in question received design approval from the FHWA. If the highway received design approval before January 1, 1970, compliance with NEPA is unnecessary; if it received design approval after February 1, 1971, compliance *is* necessary. If design approval was received during the thirteen month interval between January 1, 1970, and February 1, 1971, compliance with NEPA is required "if, in the judgment of the FHWA division engineer, implementation of [NEPA] *to the fullest extent possible* requires preparation and processing of an environmental statement." PPM 90–1, ¶ 5b. [Emphasis added.]

 The precise thrust of ¶ 5 of PPM 90–1, insofar as it pertains to highways that received design approval between January 1, 1970, and February 1, 1971, is not clear. The phrase, "to the fullest extent possible," seems to establish a very strict standard for determining whether a Section 102(2)(C) statement is necessary. Other language in the paragraph, how-

In planning the Century Freeway, moreover, defendants made virtually no attempt to evaluate the effect of the highway on air pollution in the Los Angeles basin.[10] Paragraph 11 of the Council's guidelines provides that even when the application of NEPA to an ongoing project is not practicable, "[i]t is * * important in further action that account be taken of environmental consequences *not fully evaluated at the outset of the project* or program." [Emphasis added.] "Air pollution," the Supreme Court recently observed, "is, of course, one of the most notorious types of public nuisance in modern experience." Washington v. General Motors Corp., 406 U.S. 109, 92 S.Ct. 1396, 1398, 31 L.Ed.2d 727 (1972). Air pollution in the Los Angeles basin is particularly obnoxious, and the major cause of it is automobile emission.[11] Therefore the failure to closely examine the effect of the proposed freeway on air pollution was an egregious omission. It flew in the face of the Council's guidelines; the omission also undermines the state defendants' conclusion, reached during the course of the reassessment that they made pursuant to the FHWA's Interim Guidelines, that the Century Freeway was planned "in such a manner as to give detailed consideration to the potential impact upon the quality of the human environment * * *."

Defendants contend that when NEPA went into effect very little data was available comparing the effect of freeways and city streets on air pollution. Furthermore, defendants argue, the sparse evidence that was available at the time suggested that freeways reduced air pollution because automobile emission decreases at higher speeds.[12] Plaintiffs

---

ever, seems to undermine this tough standard. Before the FHWA division engineer can make the required determination, the state highway authorities must prepare, "in consultation with" the FHWA, a written reassessment of the highway in question. All that PPM 90–1 says about this reassessment is that it "should consider if the highway plans were developed in such a manner as to minimize adverse environmental consequences." PPM 90–1, ¶ 5c. Once the FHWA division engineer has received this reassessment, he makes the determination called for by ¶ 5b. In doing so, he must take into account a variety of environmental and nonenvironmental considerations. He

> "should consider, in addition to the written reassessment prepared by the [state authorities], the status of the design; right-of-way acquisition including demolition of improvements within the right-of-way; number of families already rehoused and those yet to be rehoused; construction scheduling; benefits to accrue from the proposed highway improvement; significant impacts; and *measures to minimize any* adverse impacts of the highway." PPM 90–1, ¶ 5b.

Paragraph 5 of PPM 90–1 is, in short, ambiguous. If the test that it establishes for determining the applicability of Section 102(2)(C) is the phrase, "to the fullest extent possible," then the regulation is commensurate with the Court's interpretation of NEPA's demands. On the other hand, if the test is as flexible as the subsequent sentences in the paragraph suggest, the regulation would appear to suffer from the same shortcomings as did paragraph 4 of the FHWA's Interim Guidelines.

10. *See, e. g.,* Interstate (Century) 105 Freeway: Design Team Concepts at 33, the summary of a study conducted for the California Division of Highways by Gruen Associates; it is dated December 1970. *See also* the testimony at the hearing on the motion for a preliminary injunction of Richard McMullin, a registered civil engineer with the Division of Highways and the head of the Division's Environmental Investigation Unit for District 7 (Tr. at 261–280).

11. Mr. McMullin testified that in his opinion automobile emission was responsible for approximately 50% of the air pollution throughout the country, but was the source of between 60% and 70% of the air pollution in the Los Angeles basin. He also testified that it was the contention of the Los Angeles County Air Pollution Control District that automobile emission caused 90% of the air pollution in Southern California (Tr. at 279).

12. Mr. McMullin so testified (Tr. at 263–266). Air Quality Criteria for Carbon Monoxide, a study published by the United States Department of Health, Education and Welfare during March 1970, indicates that the emission of carbon

disagree; they contend that significant information on air pollution was available to defendants even before 1970.[13] The Court does not believe it necessary, at least on the motion for a preliminary injunction, to decide which analysis of the availability of data is the more accurate one. As long as some information on air pollution was available, NEPA and the Council's guidelines obligated the federal defendants to prepare a Section 102(2)(C) statement examining, with as much precision as was possible at the time, the impact of the proposed freeway on air quality in the Los Angeles basin. Having failed to do so in 1970, the federal defendants must do so now.

In preparing their Section 102(2)(C) statement defendants should take full advantage of the advances made in air quality measurement since 1970. The available information about air pollution and the techniques that had been perfected for measuring it may or may not have been inadequate in 1970, but considerable progress has been made since then, and defendants themselves deserve credit for some of it.[14] The Environmental Protection Agency [hereinafter EPA], acting pursuant to the Clean Air Act, 42 U.S.C. §§ 1857–1857l, has even promulgated primary and secondary ambient air quality standards for the following pollutants: sulfur oxides; particulate matter; carbon monoxide; photochemical oxidants; hydrocarbons; and nitrogen dioxide. 40 C.F.R. Part 50; 36 Fed.Reg. 22384 (Nov. 25, 1971). The primary standards define levels of air quality that the EPA deems "necessary, with an adequate margin of safety, to protect the public health," while the secondary standards define levels of air quality that the EPA deems "necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant." 40 C.F.R. § 50.2(b). Appendices attached to these standards, moreover, describe in detail methods for sampling and analyzing each of the specified pollutants. The Court assumes that the EPA's standards will be useful to defendants in evaluating the significance of any changes in air quality that the freeway will cause and that the techniques described in the appendices will be useful in actually measuring these changes.

In evaluating the impact of the freeway on air quality in the Los Angeles basin defendants should take all relevant details into account. They should consider the effect of wind and weather conditions on the dispersal of pollutants, and they must not ignore the effect of other sources of pollution. In addition, they should consider the extent to which the freeway will draw more automobiles into the southern Los Angeles basin. This case is not one in which a proposed freeway will cross a rural area, leading inevitably to rapid development and sharp increases in automobile traffic, because the Los Angeles basin is already heavily developed. Nevertheless, the construction of the Century Freeway could conceivably draw new industrial and commercial facilities into the freeway's vicinity and lead, as a result, to a significant increase in automobile traffic. This possibility should not be ignored. Furthermore, although air pollution is the most obvious problem to be considered, it does not represent the only significant environmental impact of a freeway. Defendants should, for example engage in a more thorough examination than has heretofore been conducted of the relationship between the freeway and noise pollution.[15]

monoxide does decrease at higher speeds. Plaintiffs apparently contend that the emission of certain other pollutants increases at higher speeds (Tr. at 277–278).

13. Plaintiffs cite the following two articles: Bush, Urban Atmospheric Pollution, Civil Engineering—ASCE, May 1965, at 66; Schneiderman, Cohn, and Paulson, Air Pollution and Urban Free-

ways: Making a Record on Hazards to Health and Property, 20 Cath.U.L.Rev. 5 (1970).

14. See the testimony of Mr. McMullin (Tr. at 265–267).

15. See, e. g., Interstate (Century) 105 Freeway: Design Team Concepts, supra, at 32–33.

■ Section 102(2)(C) lists five general topics that an impact statement must consider. The third requirement— that the statement consider "alternatives to the proposed action"—is a crucial one. Without it a NEPA statement becomes an academic exercise. Defendants' statement should consider all possible alternatives to the proposed freeway, including changes in design, changes in the route, different systems of transportation and even abandonment of the project entirely. *See, e. g.,* Daly v. Volpe, *supra.* In order to be realistic, on the other hand, the statement cannot ignore the substantial amount of work and money that has already gone into the Century Freeway. As Judge Eisele wrote in Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1971),

> "The Court is not suggesting that the status of the work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA * * *. [A]s the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work." 325 F. Supp. at 746.

*See also* Morningside-Lenox Park Ass'n, Inc. v. Volpe, 334 F.Supp. 132, 142 (N. D.Ga.1971).

This last point must be stressed. What Sections 101 and 102 make clear is that NEPA requires more than just the preparation of a statement. The federal defendants must actually evaluate the wisdom of proceeding with the Century Freeway project in light of whatever environmental impact their studies reveal. NEPA, as was stated in *Calvert Cliffs,* "makes environmental protection a part of the mandate of every federal agency and department." The requirement of Section 102(2)(C) that a statement be prepared merely ensures that this evaluation is conducted.

Further work on the freeway, in short, will be enjoined until the federal defendants conduct this evaluation and prepare a Section 102(2)(C) statement.

*The California Environmental Quality Act of 1970:*

On September 18, 1970, nine months after NEPA went into effect, the Governor of California signed into law the Environmental Quality Act of 1970 [hereinafter CEQA], Calif.Pub.Res.Code §§ 21000–21151. Sections 21000 and 21001 contain declarations of policy closely reminiscent of Sections 101 and 102 of NEPA. Section 21100 of CEQA follows Section 102(2)(C) of NEPA almost verbatim. It provides,

> "All state agencies, boards, and commissions shall include in any report on any project they propose to carry out which could have a significant effect on the environment of the state, a detailed statement by the responsible state official setting forth the following:
>
> "(a) The environmental impact of the proposed action.
>
> "(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.
>
> "(c) Mitigation measures proposed to minimize the impact.
>
> "(d) Alternatives to the proposed action.
>
> "(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.
>
> "(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented."

The state defendants have not prepared the statement required by Section 21100; they insist that they need not do so because CEQA is not applicable to projects that were in as advanced a state of

completion as was the Century Freeway at the time that CEQA became law. Plaintiffs, on the other hand, maintain that the state defendants must file the statement.

The resemblance between NEPA and CEQA is so uncanny that the conclusion is inescapable that CEQA was deliberately modelled after NEPA. Therefore the same considerations ought to govern the applicability of both statutes to the Century Freeway. Section 21001 of CEQA provides, in part,

" * * * [I]t is the policy of the state to:

"(a) * * * [T]ake *all action necessary* to protect, rehabilitate, and enhance the environmental quality of the state.

"(b) Take *all action necessary* to provide the people of this state with clean air and water * * * and freedom from excessive noise. * * *

"(g) *Require* governmental agencies at all levels to consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefits and costs and to consider alternatives to proposed actions affecting the environment." [Emphases added.]

Section 21001 demonstrates a commitment by California to the careful evaluation of the likely environmental impact of proposed public works projects before those projects are actually constructed.[16]

In light of this language the Court believes that compliance with CEQA does not become unnecessary until a proposed highway "has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom." Arlington Coalition on Transportation v. Volpe, *supra*. The Century Freeway, as was pointed out in the Court's discussion of NEPA, has not reached that stage.

At the time that CEQA entered into effect—*i. e.*, on September 18, 1970—the state defendants had not yet received design approval from the FHWA for two of the eight segments of the Century Freeway. State defendants, in fact, were apparently still engaged in the planning of those two segments, because they had not yet submitted their proposals for the segments to the FHWA for approval.[17] In addition, subsequent to the date on which CEQA became law, the state defendants submitted a proposal for revisions in the design of a third segment of the freeway to the FHWA for approval.[18] Because the planning of the Century Freeway was still in progress when CEQA entered into effect, compliance with Section 21100 was called for. Moreover, since the federal defendants are being required to prepare a NEPA statement, there is no reason why compliance with CEQA would be impracticable for the state defendants. The planning of a federal-aid highway requires close cooperation between state and fed-

---

16. Section 21102 of CEQA provides,
 "No state agency, board, or commission shall request funds, nor shall any state agency, board, or commission which authorizes expenditures of funds * * * authorize funds for expenditure for any project, other than a project involving only planning, which could have a significant effect on the environment unless such request or authorization is accompanied by a detailed statement setting forth the matters specified in Section 21100."
 Relying on this provision, the state defendants argue that CEQA is only applicable to a project before funds are authorized for it. The California Highway Commission approved the initial financing of the Century Freeway with funds from the State Highway Fund on October 23, 1967. Therefore, the state defendants argue, it was too late to apply CEQA to the Century Freeway when the statute entered into effect.
 The Court does not believe that the legislature intended to foreclose the application of CEQA to every project that received some funding prior to September 18, 1970. Section 21102 does not establish an exclusive deadline applicable even to projects the planning or financing of which began before CEQA's enactment.

17. *See* Exhibits MM and OO to Conrado affidavit, filed April 7, 1972.

18. *See* Exhibit PP to Conrado affidavit, filed April 7, 1972.

eral authorities, and the state and federal defendants will assuredly collaborate in the preparation of the NEPA statement on the Century Freeway. The requirements of NEPA and CEQA are so similar that preparation of a CEQA statement should demand little additional work, and whatever inconvenience compliance with CEQA causes the state defendants should be negligible.

*The Public Hearing Requirement:*

 When the state defendants began planning the Century Freeway, Section 128(a) of the Federal-Aid Highway Act, 23 U.S.C. § 128(a), required them to hold public hearings to consider the "economic effects" of constructing a freeway at the location that they proposed. The statute was amended on August 23, 1968, and several requirements were added to Section 128(a). The section now reads as follows; the requirements added in 1968 are italicized:

"Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic *and social* effects of such a location, *its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.*" [Emphases added.]

Regulations prepared by the FHWA pursuant to Section 128(a) expand upon the basic statutory requirement. *See* PPM 20–8, 23 C.F.R. Part 1, Appendix A. The FHWA regulations direct the state highway authorities to hold two sets of hearings. First, a "corridor public hearing" must be held before the state authorities select a proposed route location for submission to the FHWA for its approval. The purpose of this hearing is to ensure public participation "in the process of determining *the need for,* and the location of, a Federal-aid highway." PPM 20–8, ¶ 4a. [Emphasis added.] Second, a "highway design public hearing" must be held after the FHWA has approved the route location, but before the state authorities have selected a specific design proposal for submission to the FHWA for design approval. The purpose of this hearing is to ensure public participation "in the process of determining the specific location and major design features of a Federal-aid highway." PPM 20–8, ¶ 4b. The regulations also state that these hearings should provide "a public forum that affords a full opportunity for presenting views on * * * the social, economic, environmental, and other effects" of alternate locations and designs. PPM 20–8, ¶¶ 4a(3) and 4b(3). In addition, paragraph 4c of PPM 20–8 lists twenty-three possible "social, economic, and environmental effects" that are relevant to the selection of routes and designs for proposed highways.[19]

19. PPM 20–8, ¶ 4c, provides,
" 'Social, economic, and environmental effects' means the direct and indirect benefits or losses to the community and to highway users. It includes all such effects that are relevant and applicable to the particular location or design under consideration such as:
"(1) Fast, safe and efficient transportation.
"(2) National defense.
"(3) Economic activity.
"(4) Employment.
"(5) Recreation and parks.
"(6) Fire protection.
"(7) Aesthetics.
"(8) Public utilities.

"(9) Public health and safety.
"(10) Residential and neighborhood character and location.
"(11) Religious institutions and practices.
"(12) Conduct and financing of Government (including effect on local tax base and social service costs).
"(13) Conservation (including erosion, sedimentation, wildlife and general ecology of the area).
"(14) Natural and historic landmarks.
"(15) Noise, and air and water pollution.
"(16) Property values.
"(17) Multiple use of space.
"(18) Replacement housing.

The state defendants divided the Century Freeway into two segments for the purpose of conducting corridor public hearings. Two hearings were held for each segment—the first conducted by the Division of Highways and the second by the California Highway Commission. All four of these hearings were held before August 23, 1968, when the amendment to Section 128(a) went into effect.[20] The state defendants then divided the freeway into eight segments for the purpose of planning the highway design and securing FHWA approval for their design proposals. One segment received design approval from the FHWA on August 14, 1968.[21] Highway design public hearings for the remaining seven segments, however, were held after August 1968; these hearings, as a result, were subject to the amended version of Section 128(a).[22] The plaintiffs contend that these design hearings did not adequately consider the social and environmental effects of the Century Freeway and that neither the design hearings nor the corridor hearings provided an adequate opportunity for members of the public to present their views. Therefore the plaintiffs urge the Court to order the state defendants to hold new hearings that comply with Section 128(a) and PPM 20–8. The state defendants maintain that the hearings that they conducted were quite satisfactory.

Having examined the transcripts of the hearings and the reports on the hearings submitted to the FHWA by the state defendants, the Court is not prepared to say that the hearings were totally inadequate in their consideration of the relevant social, economic, and environmental effects, nor that they provided an inadequate "public forum * * * for presenting views" on alternate locations and designs for the freeway. The hearings may not have been ideal, but as paragraph 4c of PPM 20–8 recognizes, each possible social, economic, or environmental effect need not necessarily "be given equal weight in making a determination upon a particular highway location or design." Nevertheless, the transcripts and the reports reveal that very little consideration was given to one of the most important of the Century Freeway's effects—*i. e.*, its effect on noise and air pollution. This effect is so crucial and the consideration given to it so minimal that the Court believes that further work on the freeway should be enjoined until the state defendants certify to the FHWA that they have held, or have provided an opportunity for, new public hearings focusing on the likely effect of the freeway on air and noise pollution.

The Court's conclusion leads to the question of whether both new corridor hearings and new design hearings are ap-

"(19) Education (including disruption of school district operations).

"(20) Displacement of families and businesses.

"(21) Engineering, right-of-way and construction costs of the project and related facilities.

"(22) Maintenance and operating costs of the project and related facilities.

"(23) Operation and use of existing highway facilities and other transportation facilities during construction and after completion.

"This list of effects is not meant to be exclusive, nor does it mean that each effect considered must be given equal weight in making a determination upon a particular highway location or design."

20. The two corridor hearings for the western segment of the freeway were held on June 5, 1963, and August 13, 1965. The two hearings for the eastern segment were held on March 30, 1967, and April 16, 1968.

21. *See* Conrado affidavit, filed April 7, 1972. The affidavit does not indicate whether or not a highway design public hearing was held for that segment. It is not clear whether no hearing was held because a separate highway design hearing was not required at that time or whether a hearing was held but the affiant neglected to mention it in his affidavit.

22. The seven design hearings were held on June 24, July 8, September 17, and October 15, 1969, and January 28, April 22, and May 13, 1970.

propriate. Corridor hearings, according to the program established in paragraph 4 of PPM 20–8, precede design hearings and consider the broader issues: "the need for, and location of, a Federal-aid highway." Design hearings then consider more technical issues: "the specific location and major design features of a Federal-aid highway." The amended version of Section 128(a)—the version that was in effect when seven *design* hearings were held on the Century Freeway—required those hearings to consider the environmental effects of the proposed highway. The administrative regulations that were in effect at that time specified that the hearings were to afford "a full opportunity for presenting views on major highway design features, including the * * * environmental * * * effects of alternate designs." PPM 20–8, ¶ 4b (3).[23] Since the applicable statutory and administrative provisions were not complied with insofar as they required consideration of the effects of the highway on air and noise pollution, new design hearings clearly are necessary.

The propriety of requiring new *corridor* hearings presents a more difficult question. When the corridor hearings on the Century Freeway were held, Section 128(a) had not yet been amended, and PPM 20–8 did not exist. The corridor hearings that the defendants held, in short, complied with the statutes and regulations that were in effect at that time. Despite this fact, the Court believes that new corridor hearings are necessary. Section 102(2)(C) of NEPA requires the federal defendants to prepare an environmental impact statement. If they are to do that in good faith, they must reconsider the entire Century Freeway project. Not only must they reexamine the specific route and design that they have proposed for the freeway, but they must also consider alternate means of transportation and even abandonment of the project entirely. Section 21100 of CEQA places similar demands on the state defendants. Since NEPA and CEQA demand a thorough reevaluation, it would make little sense to require the state defendants to seek the views and observations of the public on the design of the freeway, but to excuse them from consulting with the public on the broad issue that PPM 20–8 reserves for corridor hearings—*i. e.*, the issue of "the need for" the freeway. Section 128(a) demonstrates Congress' recognition of an important principle: that experts, regardless of their training, experience, and good faith, do not enjoy a monopoly on wisdom. Section 128(a) and PPM 20–8 establish a mechanism for securing public participation in the decision making process, and defendants should use that mechanism in evaluating the advisability of continuing with the Century Freeway. This conclusion "is compelled by the congressional directive in Section 102 of [NEPA] that *'to the fullest extent possible * * * public laws of the United States shall be interpreted and administered in accordance with the policies' set forth in the declaration of policy [in Section 101 of NEPA.]*" Arlington Coalition on Transportation v. Volpe, *supra.*[24] [Emphasis added.]

23. PPM 20–8 was published in the Federal Register on January 17, 1969. 34 Fed. Reg. 728. The seven public hearings referred to in the text were conducted between June 1969 and May 1970. *See* n. 22, *supra*.

24. The required public hearings on the highway in question in *Arlington Coalition* had been held during 1958—five years before the first corridor hearing on the Century Freeway and ten years before the amendment to Section 128(a). Nevertheless, the Court of Appeals ordered the defendants to hold new public hearings. Judge Craven wrote, "We think that the requirements added to Section 128(a) apply to a highway ongoing at the effective date of the amendment if the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom." Judge Craven then stated, "As we have concluded * * * above [*i. e.*, in regard to NEPA], Arlington I–66 has not yet reached the critical stage of completion." 458 F.2d at 1337. The Century Freeway has not reached that stage either.

■ The Court does not intend to lay down detailed instructions on the format or timing of the hearings it has directed. A few observations should suffice. The Court does expect the state defendants to follow the basic procedure set forth in PPM 20–8—*i. e.*, to hold separate corridor and design hearings, with the corridor hearing or hearings preceding the design hearing or hearings. The decisions as to how many hearings are necessary or as to the number of segments, if any, into which the freeway should be divided for the purpose of conducting the hearings should be left to the sound discretion of the state defendants. In considering "the need for," the location of, and "the major design features of" the Century Freeway, the hearings should give special attention to the freeway's environmental impact, particularly its likely effect on air and noise pollution. Other "social, economic, and environmental effects" will also be relevant, however, because the decisions that the defendants must make during their reevaluation will have to be based on a balancing of the various costs and benefits of each alternative course of action.

■ A final word is necessary. The defendants have argued that the plaintiffs are barred from seeking new public hearings by the equitable doctrine of laches. There has indeed been a very long interval between the earliest public hearings and the institution of this lawsuit by plaintiffs. While this delay has no doubt inconvenienced the defendants, that inconvenience does not outweigh the public's interest in assuring that the costs and benefits of the Century Freeway project are fully and deliberately considered by the responsible public officials.

*The Relocation Statutes:*

Construction of the Century Freeway will necessitate the acquisition by the California Division of Highways of 3900 single-family dwellings and 3000 multiple-family dwellings; it will force 21,000 people to relocate. Many of these dwellings have already been acquired, and many individuals have already evacuated the freeway corridor.[25]

Federal law prohibits the FHWA from funding the construction of any federal-aid highway that will cause the displacement of persons living in the highway corridor unless the FHWA has received from the state highway authorities "satisfactory assurances":

(1) that "fair and reasonable relocation" payments for moving expenses and for "replacement housing" will be provided to persons who must relocate;

(2) that "relocation assistance programs" will be provided for such displaced persons; and

(3) that "within a reasonable period of time prior to displacement there will be available" adequate replacement housing.

These three basic requirements were initially contained in Chapter V of the Federal-Aid Highway Act of 1968 [hereinafter Highway Act], 23 U.S.C. §§ 501–511. *See* Section 502, 23 U.S.C. § 502. Chapter V was subsequently replaced by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 [hereinafter Relocation Act], 42 U.S.C. §§ 4601–4655, which applied the same basic requirements to highways and to all other federal and federal-aid projects that cause the displacement of people. *See* Section 210, 42 U.S.C. § 4630. In enacting Chapter V of the Highway Act and later in replacing it with the more comprehensive Relocation Act, Congress intended to establish relocation policies that would, in the words of Section 501 of the Highway Act, 23 U.S.C. § 501, "insure that a few individuals do not suffer disproportion-

25. *See* the testimony of Robert Acorn, Assistant District Right-of-Way Agent with the Division of Highways (Tr. at 136–144), and the testimony of Frank M. Lentz, Senior District Right-of-Way Agent with the Division of Highways and the supervisor of the Division's relocation assistance program (Tr. at 230).

ate injuries as a result of programs designed for the benefit of the public as a whole." *Compare* Section 201 of the Relocation Act, 42 U.S.C. § 4621, which expresses the same thought in similar language.

Various sections of the two statutes provide relevant details about the three basic requirements that Section 502 of the Highway Act, 23 U.S.C. § 502, and Section 210 of the Relocation Act, 42 U.S.C. § 4630, impose upon state highway authorities. These sections merit fuller explanation:

(1) *The state authorities must assure the FHWA that they will provide "fair and reasonable relocation" payments.* Section 505 of the Highway Act, 23 U.S.C. § 505, and Section 202 of the Relocation Act, 42 U.S.C. § 4622, require the state authorities to reimburse displaced persons for moving expenses. The statutes also require supplemental payments to make up the difference between the compensation that a homeowner receives from the state for his old home and the purchase price necessary to obtain comparable replacement housing. In addition, the statutes require payments for the expenses incurred in securing title to a new home and for any increases in interest payments that are required to finance comparable replacement housing. In the case of a tenant, the statutes require payments for rental increases that are necessary to obtain comparable replacement housing. *See* Sections 506 and 507 of the Highway Act, 23 U.S.C. §§ 506, 507, and Sections 203 and 204 of the Relocation Act, 42 U.S.C. §§ 4623, 4624. Under the Highway Act the maximum that could be paid to a homeowner as a supplemental payment to make up the difference between his sale price to the state and the cost of replacement housing was $5000; the maximum sum that could be paid to a tenant to make up a rent differential was $1500. Under the Relocation Act a homeowner can receive a maximum relocation payment of $15,000 to cover both the difference between his sale price and the cost of replacement housing and

his other relocation expenses; a tenant can receive as much as $4000 to cover a rent differential. *Id.* The federal government, in turn, reimburses the state for virtually all of these payments. *See* Section 504 of the Highway Act, 23 U.S.C. § 504, and Section 211 of the Relocation Act, 42 U.S.C. § 4631.

(2) *The state authorities must assure the FHWA that they will afford displaced persons "relocation assistance programs."* Section 508 of the Highway Act, 23 U.S.C. § 508, and Section 205 of the Relocation Act, 42 U.S.C. § 4625, require the state authorities to operate a relocation assistance program that will determine the needs of displaced persons and businesses for relocation assistance; assure that within a reasonable period of time prior to displacement adequate replacement housing will be available; assist the owners of displaced businesses in obtaining suitable replacement locations; and supply information concerning federal and state programs that offer financial assistance to displaced persons. The Relocation Act added two other significant requirements: the state's relocation assistance program must provide "current and continuing information on the availability, prices, and rentals, of comparable decent, safe, and sanitary" replacement housing, and it must "provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation."

(3) *The state authorities must assure the FHWA that "within a reasonable period of time prior to displacement" adequate replacement housing will be available.* Such replacement housing must be located "in areas not generally less desirable in regard to public utilities and public and commercial facilities" than is the housing that must be evacuated; it must be available "at rents or prices within the financial means of the families and individuals displaced"; it must be "decent, safe, and sanitary"; it must be "equal in number to the number of and available to such displaced

persons" as require such housing; and, except in certain cases authorized by FHWA regulations, it must be "reasonably accessible" to the places of employment of those displaced persons who require the housing. *See* Section 502(3) of the Highway Act and Section 205(c)(3) of the Relocation Act.

Plaintiffs contend that the defendants have failed to meet the requirements of the Highway Act and the Relocation Act. They allege several shortcomings; the Court will discuss each one separately.

### Statewide *versus* Project Assurances

The FHWA promulgated comprehensive regulations pursuant to Chapter V of the Highway Act during September of 1968. Instructional Memorandum 80–1–68 (Sept. 5, 1968) [hereinafter IM 80–1–68]. After the Relocation Act became law, the FHWA promulgated similar regulations pursuant to that statute. Instructional Memorandum 80–1–71 (April 30, 1971) [hereinafter IM 80–1–71], 23 C.F.R. Part 1, Appendix A. In order to enable the FHWA to monitor the state highway authorities' compliance with the three basic requirements of Chapter V of the Highway Act, paragraph 5a of IM 80–1–68 provided, in part,

"No State highway department shall be authorized to proceed with any phase of any project which will cause the displacement of any person * * until it has furnished satisfactory assurances * * * that

"(1) Relocation payments and services were or will be provided * * *.

"(2) In the event housing will not be available within a reasonable period of time prior to displacement * * *, the State shall provide a detailed statement specifying the re-

spects in which such assurance cannot be furnished, the extent to which such housing will be available prior to displacement, the period of time prior to displacement when that housing will become available and an estimate of the additional time within which such housing will become available * * *.

"(3) The public was or will be adequately informed of the relocation payments and services which will be available * * *.

"(4) No person * * * shall be required to move from his home, farm or business location without at least 90 days written notice * * *.

"(5) The State's relocation program is realistic and is adequate to provide orderly, timely, and efficient relocation of displaced individuals and families to decent, safe, and sanitary housing with minimum hardship on those affected."

By letter dated October 21, 1968, the California Division of Highways gave the FHWA division engineer assurances that purported to satisfy paragraph 5a of IM 80–1–68.[26] The FHWA notified the Division that its assurances complied with IM 80–1–68 by letter dated December 3, 1968.[27] Plaintiffs contend that these assurances referred to all federal-aid highway projects in California rather than specifically to the Century Freeway. In Lathan v. Volpe, *supra*, the Court of Appeals for the Ninth Circuit interpreted Section 502 of the Highway Act and IM 80–1–68 to demand specific assurances from the state highway authorities for each separate highway project rather than general assurances applicable to all projects in the state: "General statewide assurances and promises to comply for all federal-aid projects do not satisfy the specific

---

26. *See* Exhibit A to McElroy affidavit, filed with the Court on April 7, 1972. After the enactment of the Relocation Act and the promulgation of IM 80–1–71, the Division of Highways apparently gave the FHWA certain similar assurances. *See* Exhibit B to McElroy affidavit, *supra*. The record is not clear, however, as to whether these assurances reiterated all or part of the earlier assurances or whether they expanded upon the earlier assurances in any way.

27. *See* state defendants' Exhibit BBB, filed with the Court on April 7, 1972.

requirements of 23 U.S.C. § 502 and * * * IM 80–1–68." 455 F.2d at 1120. Neither the Division's letter containing the assurances nor the FHWA's circular memorandum dated September 5, 1968, that requested that assurances be given mentioned the Century Freeway, although an attachment to the Division's letter did refer to it in explaining a particular provision of California law. It does appear from these documents, therefore, that the Division's assurances were merely "[g]eneral statewide assurances."

The *Lathan* decision dealt with Section 502 of the Highway Act and IM 80–1–68—provisions that have been superseded by Section 210 of the Relocation Act and IM 80–1–71. The new provisions require the same basic assurances that their predecessors did. Paragraph 7 of IM 80–1–71 specifies, however, that project assurances are only necessary in regard to two points: the availability of replacement housing and the reasonableness and adequacy of the state's relocation program. Assurances on the remaining points may be given on a statewide basis. The Court believes that paragraph 7 of IM 80–1–71 represents a reasonable implementation of the Relocation Act and enables the FHWA to satisfactorily monitor a state's compliance with the Relocation Act for each specific federal-aid project in which it is engaged. Therefore the state defendants should give the FHWA project assurances on the two points for which IM 80–1–71 demands such assurances, and right-of-way acquisition for the Century Freeway should cease until the state defendants do so. In defending this lawsuit, however, both the federal defendants and the state defendants have insisted that adequate replacement housing is available and that the state's relocation program is reasonable and adequate. The Court assumes, as a result, that the appropriate specific project assurances will be promptly forthcoming and that the Court's ruling on this particular issue will have only a minimal effect on the Century Freeway project.

### Relocation Payments and Services

Plaintiffs contend that the California Division of Highways, despite the assurances that it has given the FHWA, is not providing persons who live in the Century Freeway corridor with adequate relocation payments and services. The major part of the evidence that the parties herein have presented to the Court—both in the testimony of live witnesses and in affidavits submitted before and after the hearing on plaintiffs' motion for a preliminary injunction—has dealt with this issue. Plaintiffs have tried to demonstrate that the compensation that the state is paying for the homes that it must acquire and the supplemental payments and other relocation payments that the Division of Highways is providing do not permit persons who must relocate to purchase comparable decent, safe, and sanitary replacement housing. Plaintiffs have also tried to show that the Division is not adequately informing the public of the payments and services that the law requires, and that the Division fails to provide the required services even when members of the public request them. The Court, however, does not find the plaintiffs' evidence convincing.

Plaintiffs' witnesses and affiants were, for the most part, persons living or maintaining businesses in the Century Freeway corridor or persons who had recently relocated. Defendants responded with the testimony and affidavits of several employees of the Division of Highways, including both supervisory personnel and the specific right-of-way agents who had represented the Division in its dealings with plaintiffs' witnesses. The right-of-way agents contradicted virtually all of the complaints voiced by plaintiffs' witnesses. What the evidence revealed, therefore, were differences of opinion between the right-of-way agents and the people living in the freeway corridor as to the value of the homes that the Division intended to acquire and as to the value of the homes that were available

for replacement housing.[28] Having heard the oral testimony and studied the affidavits that were offered, the Court is inclined to give greater credence to the testimony of the right-of-way agents. The right-of-way agents who testified had been trained in real estate appraisal and had had significant experience working for the Division on right-of-way acquisition. Their training and experience did not, of course, entitle their testimony to unquestioning acceptance, but the Court was genuinely impressed with the caliber of the right-of-way agents who took the witness stand on behalf of defendants. Plaintiffs' witnesses, on the other hand, displayed considerable confusion as to what they were entitled to under the applicable law. The evidence also demonstrated significant failures on the part of plaintiffs' witnesses to understand information that the Division's right-of-way agents had diligently and in good faith attempted to convey to them. The evidence in support of plaintiffs' allegations was quite meager, and to order changes in the Division's relocation assistance program on the basis of it would be improper.

The FHWA regulations under both the Highway Act and the Relocation Act require the Division to provide relocation assistance through "personal contact" with displaced persons. *See* IM 80–1–68, ¶ 6d(3), and IM 80–1–71, ¶ 12a. The Division does establish personal contact with the people living in the Century Freeway corridor, and at the initial meeting with each family the right-of-way agent assigned to that case presents the family with a packet that contains a brochure explaining the relocation services and payments that are available and the means by which they may be obtained.[29] In addition, the FHWA regulations prohibit the Division from ordering anyone to vacate his home without ninety days' written notice. *See* IM 80–1–68, ¶ 5a(4), and IM 80–1–71, ¶ 7a (3). The Division also provides a thirty-day notice; since January 1971, however, it provides, along with the thirty-day notice, a list of three comparable decent, safe, and sanitary replacement homes that are available.[30] Paragraph 11 of IM 80–1–68 and paragraph 36 of IM 80–1–71, moreover, require state highway authorities to establish a system of appeals so that displaced persons can contest the adequacy of the relocation payments that they receive. The Division has established such a procedure, and in order for the Division to defeat a displaced person's challenge to the adequacy of his relocation payments, the Division must point to three comparable decent, safe, and sanitary homes that are available to that person at a price that is no more than the sum of the compensation that he received from the state for his old home plus his sup-

---

**28.** The Highway Act and the Relocation Act do not require that the relocation supplements equal the difference between what the displaced person receives for his old home and what he pays for his replacement home; they require only that the payment equal the difference between what he receives for his old home and what comparable decent, safe, and sanitary replacement housing *ought to cost.* Section 506(a) of the Highway Act speaks of "the average price required for a comparable dwelling," and Section 203(a)(1)(A) of the Relocation Act speaks of "the reasonable cost of a comparable replacement dwelling." This detail may be responsible for some of the complaints of the plaintiffs' witnesses.

**29.** Two revisions of the brochure have been filed with the Court. The revision of November 18, 1968, forms a part of Exhibit 4 to the McElroy affidavit that was filed with the Court on May 11, 1972; the revision of October 1, 1971, was filed with the Court as state defendants' Exhibit III on April 7, 1972. *See also* the testimony of the following three right-of-way agents with the Division of Highways: Dennis Weik (Tr. at 44–45); Madeline Brown (Tr. at 80–81, 85–86, 88); Harold Binder (Tr. at 103–104). *Compare* the testimony of Prudence Wright, the owner of a rest home in Inglewood that the Division of Highways intends to acquire (Tr. at 27–29).

**30.** *See* the Lentz affidavit, filed with the Court on April 7, 1972, at ¶ 10.

**1346**

plemental relocation payments.[31] These procedures are all designed to ensure the adequacy of the payments and services that the Division provides, and from the evidence that has heretofore been presented to the Court, the Division appears to be following them.

The evidence that the plaintiffs have offered, in short, is so skimpy that the Court must conclude that the Division is providing adequate relocation payments and services, that it is adequately informing the public of the payments and services that are available, and that any incidents in which the Division has failed to do so have been isolated. It may be that plaintiffs will be able to prove the veracity of their allegations at a full trial on the merits. At the hearing on their motion for a preliminary injunction, however, they failed to demonstrate any shortcomings in the payments and services that the Division is providing under its relocation assistance program.

### Availability of Replacement Housing

In order to ensure the accuracy of a state highway department's assurances that adequate replacement housing would be available "within a reasonable period of time prior to displacement," paragraph 7b of IM 80–1–68 required the state authorities, before they could begin the acquisition of right-of-way for a freeway, to submit to the FHWA "for review and approval" a comprehensive study of the availability of replacement housing in the general vicinity of the freeway. The report was to discuss the "methods and procedures by which the needs of every individual to be displaced [would] be evaluated and correlated with available decent, safe, and sanitary housing"; the "method and procedure by which the State [would] assure an inventory of currently available compara-

ble housing which [was] decent, safe, and sanitary"; and an analysis of the inventory of the replacement housing that was available.[32]

The Division of Highways divided the Century Freeway corridor into five segments in order to prepare the replacement housing availability studies required by paragraph 7b of IM 80–1–68. Surveys were conducted during 1969;[33] reports were prepared and submitted to the FHWA "for review and approval" during that same year. The surveys produced detailed information on the needs of the people who would be displaced by the freeway: i. e., on the number of people living in each segment of the corridor; the percentage of these people who wanted to relocate in the general vicinity of their old homes; and the market value of their homes or, in the case of people who rented housing, the number of rooms in and the monthly rent paid for their apartments. The Division of Highways also attempted to secure information about the replacement housing that was available in the vicinity of the freeway corridor—i. e., its quantity and its market value or, in the case of rental housing, the monthly rent—and to correlate this information with the data on the needs of the people facing displacement. The Division of Highways also attempted to include in its studies analyses of special problems, such as the effect of racial discrimination on the availability of replacement housing for displaced blacks, the proximity to public transportation facilities of replacement housing for elderly people, and the impact of other public works projects on the relevant housing market. The surveys concluded that adequate decent, safe, and sanitary replacement housing in the vicinity of the freeway was available to people who wanted it at purchase or rental prices that were within their means. The FHWA accepted these con-

---

31. *See* the testimony of Mr. Acorn (Tr. at 211); *cf.* the Lentz affidavit, filed on April 7, 1972, at ¶ 11.

32. Paragraph 15 of IM 80–1–71 contains almost identical requirements.

33. *See* the Baker affidavit, filed with the Court on April 7, 1972, at ¶ 2.

clusions. It approved each report, although in 1971 it requested an updated study on one segment of the corridor, and it granted the Division of Highways permission to begin acquiring real estate for the Century Freeway.[34]

■ Plaintiffs contend that adequate replacement housing is not available and that the housing availability studies are inaccurate. The main target of their criticism is the way in which the Division of Highways calculated the number of homes that were available for purchase. In its studies of four of the five segments of the freeway [35] the Division calculated the number of houses that would become available to persons displaced by the Century Freeway during any one year by using the average annual turnover rate. In other words, the Division arrived at the number of houses that would become available in a given area during any one year by counting the number of owner-occupied residences that existed in the area and multiplying that figure by the percentage of houses in the area that are bought and sold during the average year. It then compared this figure to the number of persons displaced by the Century Freeway who could be expected to seek replacement housing in the same area during any one year.

The plaintiffs insist that turnover rates do not provide an accurate figure and that vacancy rates—*i. e.*, the percentage of homes that are actually vacant at any one time—provide the only accurate measure of availability. The Division of Highways defends its methodology by pointing out that virtually all houses that are sold in the Los Angeles area are sold while the seller is still living in the home. Assuming that the Division's point is well-taken, however, its use of turnover rates ignores the fact that other people besides those displaced by the Century Freeway may be expected to seek housing in the relevant areas. It also ignores the fact that construction of the Century Freeway will necessitate the demolition of housing and, as a result, reduce the supply of housing in the relevant areas. The Relocation Handbook of the United States Department of Housing and Urban Development, it is interesting to note, states at chapter 4, page 4,

"The use of turnover for relocation is not permissible. Turnover is a process, not a resource. It is the dynamic operation by which occupancy changes occur within a standing inventory over a period of time and theoretically could occur in the complete absence of vacancies, on a person-to-person basis."

34. The relevant dates for each housing study are as follows, beginning with the study for the westernmost of the five segments and progressing eastward: (1) The study for the segment between Sepulveda Boulevard and Vermont Avenue is state defendants' Exhibit EEE, filed with the Court on April 7, 1972; it is dated September 1969 and was approved by the FHWA on October 7, 1969 (*see* Exhibit U to Conrado affidavit, *supra*). The FHWA requested an updated study of this segment by letter dated March 1, 1971. The updated study is Exhibit HHH; it is dated June 21, 1971, and was approved by the FHWA on August 27, 1971 (*see* Exhibit VV to Conrado affidavit). (2) The study for the segment between Vermont Avenue and the Harbor Freeway is Exhibit CCC; it is dated April 9, 1969, and was approved by the FHWA on June 4, 1969 (*see* Exhibit N to Conrado affidavit). (3) The study

for the segment between the Harbor Freeway and Mona Boulevard is Exhibit FFF; it is dated October 1969 and was approved by the FHWA on December 12, 1969 (*see* Exhibit X to Conrado affidavit). (4) The study for the segment between Mona Boulevard and Orange Avenue is Exhibit GGG; it is dated December 1969, and was approved by the FHWA on January 16, 1970 (*see* Exhibit BB to Conrado affidavit). (5) The study for the segment between the Los Angeles River and Studebaker Road is Exhibit DDD; it is dated August 6, 1969, and was approved by the FHWA on August 25, 1969 (*see* Exhibit R to Conrado affidavit).

35. The study for the segment between Vermont Avenue and the Harbor Freeway (Exhibit CCC) is apparently the only exception.

The accuracy of the Division's figures on available housing is, in short, questionable.

The housing availability studies also have other shortcomings. Although the Division of Highways did determine the availability of rental housing by using vacancy rates rather than turnover rates, it failed in its studies on three of the five freeway segments to come up with data on the number of rooms in the available apartments; it merely divided the available apartments into categories based only on the monthly rent.[36] Nor is there any indication in the studies of how many of the available apartments were decent, safe, and sanitary. All of this information is crucial to a complete picture of the available supply of appropriate replacement rental housing. There is, in addition, a significant mathematical error in the statistics on rental housing that are contained in the housing study on the segment of the freeway corridor between the Harbor Freeway and Mona Boulevard.[37] Furthermore, despite the Division's conclusion that adequate replacement housing would be available "within a reasonable period of time prior to displacement," the statistics in the updated study for the segment between Sepulveda Boulevard and Vermont Avenue actually indicate a shortage of one-bedroom apartments that rent for less than $80 per month,[38] and the statistics in the study of the segment between the Harbor Freeway and Mona Boulevard indicate a shortage in single-family residences in the $10,501—$15,000 range and in rental housing in practically all price ranges.[39]

The significance of these shortcomings, however, is not clear. Subsequent to the completion of the housing availability studies, Congress enacted the Relocation Act, which increased the maximum relocation payments available to displaced persons to $15,000 for homeowners and $4,000 for tenants. Relocation payments of this size should bring many additional dwellings within the financial means of displaced persons. Both the Highway Act and the Relocation Act, moreover, authorize the construction of new replacement housing and the renovation of existing housing by the state highway authorities if adequate replacement housing will otherwise not be available. See Section 510 of the Highway Act, 23 U.S.C. § 510, and Section 206 of the Relocation Act, 42 U.S.C. § 4626. The severest housing shortage along the Century Freeway corridor appears to be in the Watts-Willowbrook

36. Data on the number of rooms in the available apartments does appear in the study on the segment between Mona Boulevard and Orange Avenue (Exhibit GGG) and the updated study on the segment between Sepulveda Boulevard and Vermont Avenue (Exhibit HHH).

37. See Exhibit FFF at p. 14. The state defendants calculated that 79% of the displaced people in that segment of the corridor probably wished to relocate in the same general vicinity. One hundred six apartment units renting for less than $60 per month were to be destroyed for the Century Freeway. Therefore 83 replacement units were needed, or 28 units per year for three years. The figures that appear at p. 14, however, are 53 replacement units needed (Col. II) or 18 units per year for three years (Col. III).

38. See Exhibit HHH at p. 12.

39. See Exhibit FFF at p. 8. The apparent inadequacies of the available housing supply in the vicinity of this segment of the freeway corridor may be the result of the rough measuring techniques used by the Division of Highways to gauge the demand for replacement housing. In all its studies the Division divided the displaced people into three categories: those who definitely wanted to relocate in the vicinity of their old homes; those who definitely did not want to relocate in the same area; and those who were not sure. The Division then added the percentage of those who definitely wanted to stay and the percentage of those who were not sure in order to gauge the percentage of the displaced people who desired replacement housing in the relevant area. In this particular segment of the freeway corridor, however, the percentage of those who definitely wanted to stay was extremely low—only 17%—and the percentage of those who were not sure was extremely high—62%. As a result, the total percentage used to gauge the demand for replacement housing—79%—may well have been unrealistically high.

area. The Division of Highways has sought to alleviate that shortage by moving homes from the vicinity of the Los Angeles International Airport onto vacant lots in the Watts-Willowbrook area. These homes were acquired by the state in eminent domain proceedings, and after they have been moved into Watts-Willowbrook, the state completely renovates them. The Division of Highways then makes them available to persons displaced by the Century Freeway. Only twenty-nine homes have heretofore been added to the housing supply in this way, but more will be built if there is a public demand for them.[40] The Division is also constructing 139 multiple-family units.[41] What these programs suggest is that regardless of the shortcomings of the housing availability studies, adequate replacement housing may well be available "within a reasonable period of time prior to displacement."

Having observed the employees of the Division of Highways who testified at the hearing on plaintiffs' motion for a preliminary injunction, the Court believes that these individuals are working very hard to ensure that no one will be displaced by the Century Freeway unless suitable replacement housing is available to him. The Court also believes that the relocation payments and the construction or renovation of replacement housing authorized by the Relocation Act do much to ensure that adequate housing will be available to persons displaced by the Century Freeway. Therefore, if this case were an ordinary suit for equitable relief, in which plaintiffs would be required to demonstrate the likelihood of ultimate success on the merits before

they could secure a preliminary injunction, the Court would not hesitate to deny plaintiffs the temporary relief that they seek. This case, however, is not an ordinary one.

In Lathan v. Volpe, *supra*, the Court of Appeals for the Ninth Circuit faced the problem of deciding whether to issue a preliminary injunction in light of alleged violations of NEPA and of Chapter V of the Highway Act. The Court relied upon the Supreme Court's decision in United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), and refused to consider the likelihood of the plaintiffs' ultimate success. Quoting from that decision, the Court of Appeals stated,

> " * * * we are satisfied that this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued." 310 U.S. at 30–31, 60 S.Ct. at 757.

The Court went on to declare,

> "The longer there is delay in applying Chapter 5 of the * * * Highway Act, * * * the fewer will be the residents of the corridor who receive the full benefit of the chapter. * * * In short, this is one of those comparatively rare cases in which, unless the plaintiffs receive *now* whatever relief they are entitled to, there is danger that it will be of little or no value to them or to anyone else when finally obtained." 455 F.2d at 1116–1117. [Emphasis in original.]

No one can be completely sure, on the basis of the studies heretofore conducted,

---

40. *See* the testimony of Mr. Acorn (Tr. at 114–125) ; *see also* the Gilbar affidavit and the Ralph declaration, filed with the Court on April 7, 1972.

 As of the beginning of May 1972 nine of the twenty-nine homes that the Division of Highways had moved to Watts-Willowbrook and then renovated remained vacant. *See* the testimony of Mr. Acorn (Tr. at 119). The parties disagree as to the significance of this fact. Plaintiffs contend that the houses remain va-

cant because they are small and are located on undesirable lots. *See, e. g.,* the testimony of Ward Davis, a homeowner in Watts (Tr. at 346). Defendants contend that the vacancies reflect the fact that displaced persons have found suitable replacement housing in the private housing market. *See* the testimony of Mr. Acorn (Tr. at 191–192).

41. *See* the testimony of Mr. Acorn (Tr. at 127–128).

that the available replacement housing is adequate. For many of the people still living in the Century Freeway corridor the consequences of proceeding with the freeway in the face of an inadequate supply of replacement housing could be severe. The time to determine whether the shortcomings in the housing availability studies are significant is now. Therefore the Court believes that the most equitable course of action is to order the Division of Highways to conduct additional housing availability studies, and further work on the freeway should be enjoined until the completion of those studies. The Court has already decided to enjoin further work on the Century Freeway until the defendants comply with NEPA and CEQA and until they hold additional public hearings. The shortcomings and uncertainties left by the existing housing availability studies should be resolved. The most efficient way to do that is to require the state defendants to conduct additional studies now—*i. e.*, at the same time that they comply with NEPA, CEQA, and Section 128(a) of the Highway Act.

The Court, it must be noted, is more concerned with the results of the additional studies than with the techniques used. All that the Court seeks is the alleviation of the major shortcomings of the existing studies: the failure to consider the fact that people other than those displaced by the Century Freeway will no doubt seek homes and apartments in the relevant housing markets; the failure to consider the fact that the construction of the freeway will ncessitate the demolition of housing; and the failure to gather data on the number of rooms in many of the available rental units and the percentage of these units that are decent, safe, and sanitary. The additional studies, however, should also consider the ameliorative effect of the increased relocation payments that were authorized by the Relocation Act subsequent to the conclusion of the existing studies and, in addition, the impact of the homes that will be added to the housing supply through the construction and renovation of replacement housing by the Division of Highways. Any sampling or measuring techniques that alleviate these shortcomings will be satisfactory.

*The Constitutional Issues:*

Plaintiffs contend that the public hearings that were held on the Century Freeway were so defective that the acquisition of real estate for the freeway right-of-way on the basis of those hearings violates the due process clauses of the Fifth and Fourteenth Amendments to the Constitution. They also contend that the housing market in Los Angeles County is so rigidly segregated and the available replacement housing is so limited that the displacement of black residents of the freeway corridor by the state constitutes a denial of equal protection of the laws in violation of the Fourteenth Amendment. In light of the relief that has been granted *pendente lite,* the Court does not consider it necessary to discuss these contentions at this point.

*The Scope of the Relief Granted:*

The Court's order does not determine the future of the Century Freeway. Whether or not it will ever be built remains for the appropriate federal and state administrative agencies to decide. The Court will issue a preliminary injunction in order to vindicate the important national and state policies established by NEPA, CEQA, Section 128(a) of the Highway Act, Chapter V of the Highway Act, and the Relocation Act. These statutes were enacted to protect the public interest.

█ The people living or operating businesses in the freeway corridor will continue to live in a state of uncertainty for an unforeseeable period of time. Before the fate of the Century Freeway is finally resolved, some of these people will no doubt decide, for a variety of reasons, to sell their property to the only available purchaser—*i. e.*, to the State of California. Some, for example, may decide to move because their employer has transferred them; others may simply tire of the uncertainty that they face.

To force these people to remain in the freeway corridor would not be just. The preliminary injunction that the Court will issue, therefore, will be limited in this respect: the Division of Highways will remain free, upon satisfying the Court that a particular resident or businessman has freely and voluntarily decided to leave the freeway corridor, to appraise and acquire the real property of that resident or businessman and to provide that resident, be he homeowner or tenant, or that businessman, with the relocation payments and services to which he would be entitled under the law in the absence of this preliminary injunction. This exception will not, however, authorize the Division of Highways to acquire any real estate that it is presently precluded from acquiring under California law due to the fact that the City of Hawthorne has not signed a street-closure agreement.

There is also a danger that vacant buildings, exposed utility lines, and similar by-products of the right-of-way acquisition process will become threats to the public health and safety during the period in which this preliminary injunction remains in effect. Therefore the Division of Highways will remain free, for good cause shown, to engage in such demolition or other work that is necessary to protect the public health and safety.

## MEMORANDUM AND ORDER REGARDING MOTION TO ALTER OR AMEND PRELIMINARY INJUNCTION AND MOTIONS TO INTERVENE BY VARIOUS CITIES

On July 7, 1972, this Court issued a preliminary injunction halting work on the proposed Century Freeway until such time as the federal defendants prepare the environmental impact statement required by federal law and until such time as the state defendants prepare the environmental impact statement required by state law, hold additional public hearings, provide the federal defendants with the specific project assurances required by federal regulations, and conduct additional housing availability studies. The Court's order contains two exceptions. It permits the California Division of Highways, upon satisfying the Court that a resident or businessman has freely and voluntarily decided to leave the freeway corridor, to appraise and acquire the real estate of that person and to provide him with relocation payments and services. The Court's order also permits the Division, for good cause shown, to engage in any demolition work necessary to protect the public health and safety.

The magnitude of the Century Freeway project has necessitated—and will no doubt continue to necessitate—further orders by the Court implementing the preliminary injunction. On July 21, 1972, Judge Warren J. Ferguson of this Court, who handled my calendar at my request during my absence from the district, issued an order authorizing the following activities: (1) the removal from the freeway corridor of vacant houses that had been sold to third parties prior to the Court's order of July 7; (2) the closing of escrows that had been entered into between the State of California and property owners prior to July 7, the payment of monies due pursuant to the terms of such escrows, and the payment of relocation assistance payments, provided that the affected property owners freely and voluntarily waived their right to cancel their escrows; (3) the continuation of work on those Ralph Act projects [1] in regard to which the

---

1. The Ralph Act, Sections 135.3–135.7 of the California Streets and Highways Code, empowers the Department of Public Works, of which the Division of Highways is an agency, to provide relocation assistance to persons who reside in low-income areas and who are displaced by the construction of highways. The Act also empowers the Department to acquire land and housing, to refurbish existing housing, and to construct new housing, so that adequate decent, safe, and sanitary replacement housing will be available to such displacees.

Section 135.3 declares, in part, that the Act's objectives

Division had entered into commitments prior to July 7; and (4) the payment of relocation assistance payments to individuals who had not yet relocated but who had received commitments from the Division prior to July 7. On August 4, 1972, Judge Ferguson, upon a showing by the Division that the affected property owners had freely and voluntarily decided to sell their property to the State of California, issued a further order authorizing the Division to proceed with five specific eminent domain actions then pending in the state courts and to purchase five other specific parcels of real estate directly from the owners.

This matter came on for hearing again on August 28, 1972, on the state defendants' motion to alter or amend the preliminary injunction and on motions to intervene filed by the Cities of Downey, El Segundo, Inglewood, Lynwood, Paramount, and South Gate. The state defendants ask the Court to eliminate from the preliminary injunction the various requirements that it has ordered them to satisfy. They also ask, apparently in the alternative, that the Division of Highways be permitted to continue acquiring property in the proposed freeway right-of-way while the environmental impact statements required by the preliminary injunction are prepared. The state defendants also ask—again, apparently, in the alternative—that nine activities be exempted from the proscriptions of the preliminary injunction. The federal defendants join in the state defendants' motion, but only insofar as it asks the Court to eliminate the requirement of additional public hearings from the terms of the preliminary injunction.

*The Motions to Intervene:*

██ As presently planned, the Century Freeway will pass through, *inter alia,* the cities of Hawthorne, Downey, El Segundo, Inglewood, Lynwood, Paramount, and South Gate. The Court has already permitted Hawthorne to intervene; the other aforementioned cities now seek to intervene, too. These cities have a very real interest in the future of the Century Freeway and in any orders by this Court regulating or prohibiting work on the freeway. The State of California has already purchased a considerable amount of real estate in these cities, and it plans to purchase more. The cities are entitled to intervene in this lawsuit as of right, pursuant to Rule 24(a) of the Federal Rules of Civil Procedure. The motions to intervene will be granted.

*The Requirements Imposed by the Preliminary Injunction:*

The Court will not eliminate from the preliminary injunction any of the requirements that it ordered the state defendants to satisfy. The Court issued a preliminary injunction because it concluded that the state defendants had failed to comply with federal and state environmental protection laws and with other legal requirements and that the public interest demanded prompt compliance with those provisions. In its July 7 order the Court discussed its reasons for reaching these conclusions at length; the Court believes that, with one exception, additional discussion is unnecessary. Some further observations on the Court's reasons for ordering additional

"can best be achieved by enabling low-income persons in economically depressed areas affected by state highway construction to participate in the development and execution of the replacement housing program. Accordingly, when the initial replacement housing program is undertaken for the assistance of persons displaced by the construction of State Highway Route 105 in Los Angeles County [*i. e.,* the Century Freeway], such program shall

be conducted in a manner conducive to maximum community participation, thereby assisting in alleviation of excessive unemployment by utilizing local labor and contributing to the development of training programs for unskilled labor."
In order to achieve these ends, Section 135.3 exempts "this initial replacement housing program" for the Century Freeway from "conventional contracting procedures, including competitive bidding."

public hearings, however, would be useful.

In its July 7 order the Court stated that the public hearings that the state defendants had conducted had not been "totally inadequate in their consideration of the relevant social, economic, and environmental effects" of the proposed freeway and had not "provided an inadequate 'public forum * * * for presenting views' on alternate locations and designs for the freeway." The Court concluded, however, that the hearings had given only "minimal" consideration to one of the most crucial of the freeway's effects—*i. e.*, its effect on noise and air pollution. Therefore the Court ordered the state defendants to conduct additional design hearings. The federal defendants argue, in support of the state defendants' motion to alter or amend the preliminary injunction, that Section 128 (a) of the Federal-Aid Highway Act, 23 U.S.C. § 128(a), requires only that "a public hearing be held or that an opportunity for a public hearing be afforded." (Federal Defendants' Memorandum in Support of Motion to Alter or Amend Preliminary Injunction, p. 1.) The federal defendants contend that

> "where, as here, public hearings were actually held and the public is afforded the opportunity to present its views regarding the economic, social and environmental effects of the freeway, the statutory requirement has been met even if the public did not utilize the opportunity to present views on particular subjects." (Federal Defendants' Memorandum, p. 2.)

The Court believes that the public hearing requirement is broader in scope than the federal defendants contend. The state highway authorities must do more than merely permit members of the public to come to an auditorium and express whatever concerns they might have at the time. PPM 20–8, 23 C.F.R. Part 1, Appendix A, which implements Section 128(a), imposes upon the state authorities the responsibility to provide people who attend public hearings with information about the alternatives that exist. Paragraph 8a(3) of PPM 20–8 provides that the state highway authorities must notify the public, in advance of the hearings, that "maps, drawings, and other pertinent information developed by the State highway department * * * will be available for public inspection and copying" prior to the public hearings. Paragraph 8b(3) of PPM 20–8 provides,

> "At each required corridor public hearing, pertinent information about location alternatives studied by the State highway department shall be made available. At each required highway design public hearing information about design alternatives studied by the State highway department shall be made available."

The state defendants did not meet their obligations by simply convening hearings. Air and noise pollution is one of the social, economic, and environmental effects listed in paragraph 4c of PPM 20–8; information about the problem clearly is pertinent to the consideration of the design alternatives that are available on a given freeway project. The consideration given to air and noise pollution at the design hearings on the Century Freeway was inadequate not because the members of the public in attendance expressed little interest in the problem, but because little information about the problem was made available to the public. Therefore additional design hearings are appropriate.

In their papers in support of their motion for a preliminary injunction the plaintiffs launched a broad attack on the adequacy of the public hearings on the Century Freeway. This attack included severe criticism of the format of the hearings. Plaintiffs alleged that the way in which presentations by state officials and intermissions were scheduled discouraged the members of the public in attendance from presenting their views. Plaintiffs also contended that the refusal to accept questions other than at certain times and the refusal to accept questions on certain subjects had the same result. The Court, however,

was not convinced by these criticisms of the format of the public hearings. With these criticisms in mind the Court stated in its July 7 order that it was "not prepared to say that the hearings * * * provided an inadequate 'public forum * * * for presenting views' on alternate locations and designs for the freeway." (Memorandum and Order, p. 20.) The defendants apparently interpret this statement to mean that the public hearings constituted a completely adequate "public forum * * * for presenting views"—*i. e.*, that they fully complied with the requirements set forth in paragraph 4 of PPM 20–8. The Court, however, intended merely to say that it believed that the procedural details attacked by the plaintiffs—the timing of presentations, intermissions, and question periods, and the restrictions on the subject matter of the questions—did not render the hearings inadequate; the Court did not mean to imply that the hearings provided completely adequate public forums. The state defendants had the duty to provide the public with relevant information about the available alternatives, including information about the environmental effects of these alternatives. The consideration given at the hearings to the crucial issues of air and noise pollution was minimal, however, and in that respect the design hearings were not adequate.

The defendants also argue that no additional corridor public hearings are necessary, because the corridor hearings that they held complied with the statute and regulations that were in effect at the time. The Court disagrees. "The message of NEPA," the Court observed in its July 7 order, "is loud and clear." (Memorandum and Order, p. 9.) Both NEPA and CEQA require the defendants to prepare environmental state-

ments. In doing so, the defendants must actually reevaluate the Century Freeway. They must consider, *inter alia,* "the environmental impact of the proposed action," especially its effect on air and noise pollution; "alternatives to the proposed action," including other modes of mass transportation; and abandonment of the project *versus* continuation. *See* Section 102(2)(C) of NEPA. In short, they must reconsider, in the language of paragraph 4a(2) of PPM 20–8, "the need for" the Century Freeway.

NEPA itself contains no requirement of a public hearing. Under Section 128(a) and PPM 20–8, however, state highway authorities may not make decisions on basic issues such as "the need for" a highway until members of the public have had the opportunity to express their views at corridor public hearings. Section 128(a) and PPM 20–8 should, the Court believes, be applied to the reevaluation of the freeway that compliance with NEPA requires. NEPA and Section 128(a) are not independent of each other; they are both part of a structure of federal law designed to protect the environment. Both statutes demand that environmental issues be considered in the planning of federal-aid highways.[2] Section 128(a) stands for the proposition that members of the public have the right to be consulted—to obtain pertinent information and to express their views—on the important decisions that affect the construction of federal-aid highways. This is why additional corridor hearings are required.

*Right-of-Way Acquisition Pending Compliance with NEPA and CEQA:*

As of April 24, 1972, the State of California had acquired 55.8% of the 6073 parcels of land that it intends to purchase in order to clear the proposed

2. The applicability of Section 128(a) and PPM 20–8 to the reconsideration of a federal-aid highway pursuant to NEPA finds support in the directive in Section 102 of NEPA that "to the fullest extent possible * * * public laws of the United States shall be interpreted and administered in accordance with the policies" set forth in Section 101 of NEPA. *See also* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972); *cf.* Ward v. Ackroyd, 344 F.Supp. 1202 (D.Md.1972).

freeway corridor; by now it certainly owns many more parcels. The state defendants ask that they be permitted to continue acquiring right-of-way for the freeway, without any restrictions, pending the preparation of environmental impact statements in compliance with NEPA and CEQA. They contend that once the entire right-of-way has been cleared, it will be easier for the highway authorities to decide to abandon the freeway project, if such a decision is warranted, because it will be easier to dispose of the large blocks of real estate that the State will own at that point. The Court will not grant the state defendants such permission for two reasons.

The Court would anticipate that the more the defendants spend on the freeway—whether for land acquisition or for some other purpose—the more difficult it will be to decide to abandon the project. Proceeding with right-of-way acquisition, in short, would impede the objective reevaluation of the freeway project that NEPA and CEQA require.

The preliminary injunction is also designed to ensure that people now living in the freeway corridor will not be displaced until there are satisfactory guarantees that adequate replacement housing is available. The state defendants had concluded, prior to the Court's July 7 order, that adequate replacement housing was available, but the Court held in its July 7 order that the studies on which these conclusions had been based were inadequate. Therefore it ordered the state defendants to conduct additional studies. After the preliminary injunction went into effect, the plaintiffs submitted to the Court a study of the housing market in Los Angeles County conducted by the county's Regional Planning Commission.[3] The study concludes that the county suffers from a serious housing shortage. In light of the danger that adequate replacement housing is not available, it would not be wise to permit the state defendants to purchase real estate from persons other than those who freely and voluntarily decide to sell to the state.

*Exceptions to the Preliminary Injunction:*

The state defendants ask that several types of activities be exempted from the proscriptions of the preliminary injunction. In regard to three of these activities the motion is moot: the order signed by Judge Ferguson on July 21 authorized the removal of houses that had been sold to third parties prior to July 7 and, under certain circumstances, the closing of escrows that had been opened prior to July 7 and the payment of relocation assistance payments; the state defendants indicated at the oral argument on the motion to alter or amend that they are satisfied with the scope of the July 21 order. Other portions of the state defendants' motion require further discussion.

The state defendants seek permission to proceed with "[p]ayments and contracts which provide for increased housing in the vicinity of the I–105." (State Defendants' Notice of Motion and Motion to Alter or Amend Preliminary Injunction, p. 2.) The order issued on July 21 authorized the state defendants to proceed with Ralph Act projects in regard to which the state defendants had entered into commitments prior to July 7. The state defendants now seek blanket authorization to proceed with any future Ralph Act projects in which they may eventually decide to engage. The Court intends to consider future Ralph Act projects on a case-by-case basis, and it will deny the state defendants the blanket authorization for which they ask. They will be required to seek approval for each individual construction project. In light of the Court's preference for a case-by-case approach, it would be helpful if the Court explained its views in regard to such future construc-

3. Los Angeles County Regional Planning Commission, Los Angeles County Housing Element (Oct. 1, 1971). Plaintiffs also submitted a summary of the study, entitled *Shelter*, which was published on July 1, 1971.

tion. The Court anticipates that, barring evidence that has not yet been presented to it, it will look favorably upon requests for authorization to build additional housing. In considering the state defendants' request for permission to acquire additional right-of-way pending compliance with NEPA, the Court voiced the concern that the more the defendants spend in connection with the Century Freeway, the more difficult it will be to objectively reevaluate the freeway project. Plaintiffs may argue that this danger also applies to authorizing the state defendants to proceed with Ralph Act projects. The Court anticipates, however, that any additional funds spent on the construction of replacement housing will be small in comparison to the additional funds that might be spent on right-of-way acquisition. Therefore the Court anticipates that the construction of future replacement housing would have a minimal effect on the reevaluation of the freeway project. Furthermore, the Los Angeles County Regional Planning Commission's housing study, which was submitted to the Court by the plaintiffs, concludes that there is a serious housing shortage in Los Angeles County. In light of the danger that this serious housing shortage exists, the Court does not anticipate that it would be in the public interest to enjoin the construction of additional housing. These thoughts are tentative, however, and are only intended to aid counsel in preparing to present or oppose any future motions regarding Ralph Act projects. The Court reserves any actual decisions on future Ralph Act projects until after the appropriate motions have been filed, briefed, and argued.

The state defendants also ask for permission to proceed with all eminent domain actions—regardless of whether or not the property owners consent—that were instituted prior to the temporary restraining order issued, with the consent of the defendants, on March 15, 1972. The Court will not permit the state defendants to acquire the property of any property owners who do not freely and voluntarily consent to the acquisition. The Court discussed its reasons at length in its July 7 order.

The state defendants seek authority to demolish or remove houses that become vacant, and to remove fixtures that are in danger of being vandalized, without obtaining authorization from the Court on a case-by-case basis. The City of Downey seeks enforcement of those provisions in its street-closure agreement with the Division of Highways that require the Division to promptly demolish such homes that it has acquired in Downey once they become vacant. The Court will not grant the blanket authorization that the state defendants and Downey seek. The Court recognizes that vacant buildings can become threats to the public health and safety; in its July 7 order the Court took this danger into account by authorizing the demolition, upon good cause shown, of such buildings that do become threats to the public health and safety. In any event, the Court believes that proper procedures can be devised so that the demolition or removal of improvements can be considered expeditiously on a case-by-case basis. The blanket approval that the state defendants and the City of Downey seek might well impede the thorough and objective reevaluation of the Century Freeway that NEPA and CEQA demand.

The state defendants also ask the Court to exempt from the preliminary injunction contracts that the Division of Highways entered into with outside agencies, prior to July 7, for planning the relocation of public utilities. The Court will not grant this request; there has been no showing that any significant harm will result from holding these contracts in abeyance while the preliminary injunction remains in effect. There is, furthermore, the danger that proceeding in any way with the freeway as presently planned will jeopardize the objective reevaluation that NEPA and CEQA require.

The Court realizes that the delay caused by the preliminary injunction will

increase the cost of the Century Freeway if it is ever completed, temporarily inconvenience many individuals, and hinder the planning programs of several of the cities along the route of the freeway. It is necessary, however, to look to the ultimate benefit which hopefully will accrue to everyone living in the Los Angeles area from compliance with our federal and state environmental protection laws. The federal and state highway authorities have not complied; that is why a preliminary injunction is necessary.

The Court's order of July 7 was designed to protect both those property owners who desire to remain in the freeway corridor and those who freely and voluntarily decide to leave. The Court still believes that the best way to accomplish this end is to consider each parcel of land on a case-by-case basis—i. e., to decide whether each property owner decided freely and voluntarily to sell his property. In light of the Court's preliminary injunction, of course, the State of California cannot purchase anyone's property unless it first satisfies the Court that the property owner is acting freely and voluntarily; the State, in short, must petition the Court for approval in each case. The Court has processed—and will continue to process—these applications for approval expeditiously. The state defendants may present these applications on an *ex parte* basis, as long as the plaintiffs receive actual notice of all hearings. The Court believes that these applications can be processed in as little as a few hours, or at most a day or two; the Court intends to ensure that any inconvenience that will be caused to property owners who freely and voluntarily decide to sell to the State will be minimal.

It is ordered that the motions to intervene of the cities of Downey, El Segundo, Inglewood, Lynwood, Paramount, and South Gate are granted.

It is further ordered that the state defendants' motion to alter or amend the preliminary injunction is denied.